Mary OLSON and Donald
Olson, Plaintiffs,

v.

Frank A. TROIKE, et al., Defendants.

No. 96 C 2312.

United States District Court,
N.D. Illinois,
Eastern Division.

March 17, 1997.

Charles Locker, Lincolnwood, IL, for plaintiffs.

George P. Blake, Philip L. Mowery and Kelly A. Star of Vedder, Price, Kaufman & Kammolz, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This action was originally brought by Mary and Donald Olson (collectively "Olsons") in the Circuit Court of Cook County against Frank Troike ("Troike"), Alfred Jensen ("Jensen"), John Tiernan ("Tiernan"), Michael Cronin ("Cronin") and Richard Ugolini ("Ugolini") in their capacity as trustees (collectively "Trustees") of the Central Steel & Wire Company Medical Plan (the "Plan"). Olsons seek a declaration of health insurance coverage and the payment of medical bills incurred as a result of a motorcycle accident in which Donald sustained injuries. Because this action involves an employer-sponsored welfare benefit plan, it necessarily implicates the Employee Retirement Income Security Act of 1974 ("ERISA," 29 U.S.C. §§ 1001–1461), thus supporting Trustees' removal of the case to this District Court.

Both sides have now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. They have complied with General Rule ("GR") 12(M) and 12(N) that this District Court has adopted to facilitate the resolution of Rule 56 motions, under which the litigants must respectively submit factual statements in support of and in opposition to such mo-

tions.[1] With the cross-motions now being fully briefed, the issues are ready for decision. Although both motions must be denied for the reasons set forth in this memorandum opinion and order, this action is remanded to Trustees and dismissed without prejudice so that Trustees may deal with Olsons' claim appropriately.

### Summary Judgment Standards

Under familiar Rule 56 analysis, a party seeking summary judgment bears the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). This Court is called upon to draw inferences in the light most favorable to the non-moving party, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there)". Where as here cross-motions for summary judgment are involved, these principles require the Court to take a dual perspective—one that this Court has frequently described as Janus-like. In this instance that problem does not exist, for the underlying facts are not in dispute—instead the parties are at odds only about whether as a matter of law Trustees properly exercised their duties as administrators of the Plan.

### Background

Central Steel & Wire Company ("Central Steel") has established the Plan as a self-funded group health plan administered by Trustees pursuant to Article III of the Central Steel Health Plan Trust Agreement ("Trust Agreement" or, where a specific provision is being cited, "TA") (T. 12(M) ¶1). At all times relevant to this litigation Mary was an employee of Central Steel and a participant in the Plan. Mary's husband Donald was covered by the Plan as a "dependent" (T. 12(M) ¶2).

At about 1 p.m. on July 3, 1995 Donald was brought to the Christ Hospital and Medical Center ("Christ Hospital") emergency room after being involved in a single-vehicle motorcycle accident (T. 12(M) ¶6; Complaint ¶3(C)). As a result of the accident Donald suffered a tear in his right upper eyelid and a fractured vertebra (T.App.62, 77). Donald remained hospitalized until July 11 and accumulated more than $35,000 in medical bills (T.App. 74; O. 12(N) ¶9; Complaint ¶5).

At 6:22 p.m. on July 3 a toxicology report was taken, reflecting Donald's blood alcohol level to be .235 ml/dl (T. 12(M) ¶7),[2] or nearly 2 1/2 times the then-existing Illinois level of legal intoxication.[3] That same report also indicated the presence of THC in Donald's system, suggesting that Donald had previously used marijuana (T. 12(M) ¶7; O. 12(N) ¶7). On July 5, while Donald was still hospitalized, Dr. John Olivieri was called in for a consultation to take place the next day regarding Donald's chemical dependency (T.App.20). Dr. Olivieri's July 6 notes as to that consultation recite Donald's .235 ml/dl alcohol content, his positive test for marijuana and the fact that Donald had "apparent DT's [delirium tremens] with withdrawal" (*id.*). Dr. Olivieri treated Donald on July 6, 7 and 10, and he later diagnosed Donald with Alcohol Dependency and Alcoholic Psychosis, as those terms are defined by the diagnosis codes on Donald's Health Insurance Claim Form covering Dr. Olivieri's services (T.

---

1. Trustees' statement will be cited "T. 12(M) ¶—," and Olsons' response will be cited "O. 12(N) ¶—." Those same "T." and "O." abbreviations will be used in referring to the parties' other submissions.

2. Mysteriously, a separate toxicology test performed immediately upon Donald's admission into Christ Hospital (it was shown as having been taken at 12:49 p.m.) had indicated that there was *no* alcohol in Donald's system (O.12(N) ¶7; T.App. 110). That earlier report appears impossible to reconcile with (1) the extremely high level of alcohol present in Donald's system when he was tested at 6:22 p.m. that same day, (2) the accounts of all parties—including Olsons' attorney—that Donald had consumed at least *some* alcohol prior to his accident (T.App.131, 134) and (3) Donald's later symptoms of alcohol withdrawal (and professional treatment related to those symptoms) (T. 12(M) ¶8).

3. That alcohol level would be 3 times the .08 level that has been newly approved by the Illinois Senate and is under consideration by the House of Representatives as of the time this opinion is being issued.

12(M) ¶9; O. 12(N) ¶9; T.App. 21). Dr. Olivieri charged $227 for those services (*id.*).

Olsons submitted claims under the Plan for all of the expenses incurred as a result of Donald's hospitalization and follow-up treatment. On October 24, 1995 Trustees wrote Mary a letter denying Olsons' claims in their entirety (T.App.155). Trustees based that denial on exclusions contained in Plan § 11.1, which provides in pertinent part (T.App.136–37):

> No benefits will be provided ... with respect to:
>
> (m) Expenses incurred in connection with the treatment of either alcoholism, drug addiction or both.
>
> (n) Expenses incurred in connection with the treatment of a condition caused by alcoholism, drug addiction or the illegal use of drugs.

Then on February 2, 1996 Trustees wrote a letter denying Olsons' appeal from that denial—they concluded on reviewing the record before them (T.App.157–58):

> Mr. Olson's injuries are the direct result of the excessive use of alcohol (a classic manifestation of alcoholism) and/or the use of illegal drugs. Thus, the Board concludes that Mr. Olson's medical claims were expenses incurred to treat a condition caused by alcoholism, drug addiction or the illegal use of drugs.[4]

This action followed.

## Standard of Review

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) is the seminal case defining the standards for reviewing ERISA determinations by plan fiduciaries such as Trustees:

> As this case aptly demonstrates, the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue. Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed

> under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

And *Morton v. Smith,* 91 F.3d 867, 870 (7th Cir.1996) (citations omitted) has recently elaborated on *Firestone,* identifying just how the appropriate judicial standard of review is to be gleaned from an ERISA benefits plan:

> We have previously held that *Firestone* did not establish a single standard for reviewing the discretionary decision-making of plan fiduciaries. Rather, *Firestone* presented a "smorgasbord of possibilities" for standards of review. The extent of discretion determines the extent of judicial deference. When fiduciaries have the discretion to make "reasonable" interpretations of a plan, their decisions are reviewed according to the familiar abuse-of-discretion standard. A decision constitutes an abuse of discretion when it is "not just clearly incorrect but downright unreasonable." When fiduciaries are bound to interpret the plan under the broad standard of good faith, their discretion is even more extensive, and judicial review is even more deferential. Courts will then examine the exercise of this degree of discretion to determine whether it is arbitrary and capricious.

■ In this instance TA Art. III, § 2 (reproduced at T.App. 150) plainly commits Trustees to the exercise of "good faith" in construing the Plan and Trust Agreement:

> *Section 2. Delivery of the Plan to the Trustees.* The Company shall deliver to the Trustees a copy of the Plan and of each amendment thereto. The Trustees shall have the power to construe this Trust Agreement, the Plan and the terms used herein, and any construction adopted by the Trustees in good faith shall be binding upon the Company, Participants, Beneficiaries and any other person or persons

---

**4.** [Footnote by this Court] Ugolini has testified that Donald's positive test for marijuana was "not any part of the reason for either [the] original or [the] appeals denial of his claim" (Ugolini Dep. 90). Hence Trustees have not maintained in the proceedings before this Court that Olsons' claim was denied under the Plan's exclusion for "conditions caused by ... drug addiction or the illegal use of drugs." This opinion therefore focuses only on the alcoholism issue.

dealing with or having any claims arising out of or with respect to the Trust or Plan.

Hence *Morton* requires that this Court review Trustees' denial of Olsons' claim under the "arbitrary and capricious" standard.

■ By way of a parenthetical observation on that score, it is worth noting that the earlier quotation from *Firestone,* 489 U.S. at 115, 109 S.Ct. at 956 identified *two* categories of discretionary authority that, if granted to ERISA trustees, replace de novo review with a dramatically lessened level of judicial scrutiny: (1) discretion "to determine eligibility for benefits" and (2) discretion "to construe the terms of the plan." Every careful lawyer who drafts a plan or trust agreement post-*Firestone* might then be expected to echo that language to provide the greatest leeway for the plan's fiduciaries. But oddly enough TA Art. III, § 2 speaks only in terms of allowing Trustees the second type of discretion and is wholly silent as to the first. That distinction has not been picked up by Olsons' counsel as a possible predicate for any sharper scrutiny of Trustees' factual determinations—indeed, their counsel concedes at O. Mem. 2 that "the language of the Health Plan" permits review only under "the so-called deferential or arbitrary and capricious standard of review." This opinion has thus reviewed Trustees' decision in its entirety under the arbitrary and capricious standard, without expressing any ultimate view as to whether plan documents that are drafted (as here) in a more limited fashion than permitted under *Firestone* may call for a sharper look at what the plan fiduciaries have done in the unmentioned area—that question may await another day.

To return to the situation here, Olsons—although conceding that the language of the Trust Agreement would ordinarily require application of the deferential "arbitrary and capricious" standard (Olson Mem. 2)—suggest two reasons for more exacting scrutiny in this case. Each of those suggestions, however, must be quickly dispatched in light of firmly established principles of ERISA law in this Circuit.

■ First, Olsons argue that Trustees' positions as directors and executive officers of Central Steel (held concurrently with their positions as Plan Trustees) create a "patent conflict of interest" that should minimize the deference paid to their decisions as Trustees.[5] Because the Plan is self-funded—in part by cash injections from Central Steel's general corporate funds—Olsons suggest that Trustees were predisposed to deny their health benefit claim to minimize corporate expenditures. But that line of reasoning was rejected in *Gallo v. Amoco Corp.,* 102 F.3d 918, 921 (7th Cir.1996) (citations omitted and adapted to this case):

> To give a plan administrator such power [discretion to interpret the plan], when the administrator is the employer, may seem a case of putting the fox in charge of the henhouse. Although the employer cannot appropriate the plan's assets directly, the fewer the benefits paid out the likelier the plan is to become overfunded, in which case the employer can reduce his contributions; and if the plan is terminated, assets not required to satisfy the participants' claims can be recaptured by the employer. But that is not the whole picture. Retirement benefits are a valued component of total compensation, so that the employer who is tight-fisted in computing benefits, or who gets a reputation for unfairness in passing on claims, may find himself having to pay higher wages.

> \*　　\*　　\*　　\*　　\*　　\*

> There is no need to go deeper into the question of the extent to which employers can be trusted to administer their retirement plans fairly. The question is not open for us.

> The standard of judicial review is clear: [Trustees] denial of [Olsons'] claim can be set aside only if the denial was arbitrary and capricious.

5. Four of the five Trustees are also members of Central Steel's Board of Directors—only Ugolini does not sit on the Board. All five Trustees also hold high-level executive offices with Central Steel: Jensen is president, Troike is CEO, Cronin is vice-president of credit and corporate secretary, Tiernan is executive vice-president for sales and Ugolini is vice-president of finances (O.App.1–2).

In light of decisions such as *Gallo,* the possibility that Trustees might have been able to save approximately $35,000 from a Plan that paid more than $5.5 million in benefits in 1995 does not affect the otherwise applicable arbitrary and capricious standard of review (O.App.4).

Second, Olsons suggest that the rule of contra proferentem limits the discretion to which Trustees are entitled when interpreting the Plan. Once again Olsons' position is foreclosed by clear law in this Circuit. For although that rule is frequently relevant to the interpretation of an ERISA benefit plan, it has no application where the terms of the plan expressly permit its administrators to construe plan language (*Morton,* 91 F.3d at 871 n. 1) (citations omitted):

The federal common law of ERISA does provide that ambiguous terms in benefit plans should be construed in favor of beneficiaries. But this rule has no application here. Often called the rule of *contra proferentem,* it is a device for determining the intended meaning of a contract term in the absence of conclusive evidence about intent. Courts invoke this rule when they have the authority to construe the terms of a plan, but this authority arises only when the administrators of the plan lack the discretion to construe it themselves. Therefore, it is only used when courts undertake a *de novo* review of plan interpretations. When the administrators of a plan have discretionary authority to construe the plan, they have the discretion to determine the intended meaning of the plan's terms. In making a deferential review of such determinations, courts have no occasion to employ the rule of *contra proferentem.*

In this instance TA Art. III § 2 plainly provides Trustees with "the power to construe ... the Plan" (T.App.150). Hence the rule of contra proferentem does not affect the arbitrary and capricious standard by which Trustees' actions are to be reviewed.

### Arbitrary and Capricious Standard

*Exbom v. Central States, S.E. and S.W. Areas Health & Welfare Fund,* 900 F.2d 1138, 1142-43 (7th Cir.1990) (citations omitted) has identified in detail the task that this Court faces in reviewing Trustees' denial under the arbitrary and capricious standard:

The arbitrary and capricious standard holds that a trustee's decision shall not be overturned on a § 1132(a)(1)(B) matter, absent special circumstances such as fraud or bad faith, if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." "[A] court will not set aside the denial of a claim if the denial is based on a reasonable interpretation of the relevant plan documents." Nor will it do so where the trustee has based its decision "'on a consideration of the relevant factors'" that encompass the "'important aspect[s] of the problem'" before it. If the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final.

Although Trustees' discretion to deny claims under the Plan is quite broad, it is not unbounded. Trustees' denial of Olsons' claim may be deemed an "informed judgment" only if it was based on "substantial evidence" found in the record before Trustees (*Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir.1995) (citations omitted and alteration in original)):

A denial of a claim challenged under § 502(a)(1)(B) is arbitrary and capricious if "there has been a clear error of judgment," that is, if the decision was "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Substantial evidence in turn "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] ... requires more than a scintilla but less than a preponderance."

### Trustees' Interpretation and Denial of Olsons' Claim

By its terms the Plan excludes from coverage "expenses incurred in connection

with the treatment of *a condition caused by alcoholism* ...." (T.App.137) (emphasis added). Trustees relied on that language to deny Olsons' claim, finding that Donald's injuries (and hence his medical expenses) were a "direct result" of his alcoholism (T.App. 157–58). Interestingly, Trustees construe the Plan to exclude only expenses incurred by a claimant because he or she was alcohol-dependent at the time of injury—a claim by someone who was similarly intoxicated at the time he or she caused an accident, but who was not deemed alcohol-dependent, would be paid under the Plan (O.App.18). That distinction subsumes a reading of Plan § 11.1 under which any accident that is caused by any alcoholic consumption by an alcohol-dependent person is considered to be "a condition *caused* by alcoholism." [6] Thus Trustees' determination to deny Olsons' claim was based upon two necessary factual findings: (1) Donald was alcohol-dependent at the time of his motorcycle accident and (2) his consumption of alcohol (and hence, by way of Trustees' conclusive presumption, his alcohol dependence) caused his injuries.

Olsons attack Trustees' interpretation of the Plan language on two bases. Those will be considered here in turn.

■ First, Olsons identify Trustees' position as inconsistent with advice that Central Steel Plan administrators had received earlier from an outside consultant. In that regard Olsons point to language from a September 20, 1995 correspondence from CoreSource to a Plan claims examiner that discussed an earlier (and quite similar) claim (Pl.App.23):

> The patient had ingested alcohol prior to the time of a fall, causing a laceration to his forehead. Whatever the level of alcohol in his blood, there is no way you can prove, even if he was legally drunk, that this is what caused him to fall. The charges as billed, therefore, should be covered and payable under your plan.

Regarding your plan exclusion for expenses incurred to treat a condition caused by alcoholism ... remember that the ingestion of alcohol is not the same as being diagnosed with alcoholism. I feel the letter of your plan means to exclude treatment in a rehab facility and therapy, etc.

■ Clearly, however, a third-party adviser's disagreement with Trustees' interpretation of the Plan is insufficient to label Trustees' position as arbitrary. As *Gallo,* 102 F.3d at 922 (again adapted to this case) has said:

> Indeed, it is doubtful whether the terms "correct" and "incorrect" can be used to characterize answers to difficult interpretive questions presented by [benefit] plans.

Trustees apparently decided to reject the opinion of CoreSource and to give a broad reading to the Plan's exclusion for a "condition caused by alcoholism" (T.App.137). With the Trust Agreement having granted Trustees full power to construe the Plan (T.App.150), this Court may upset that interpretation only if it is demonstrated to be arbitrary and capricious. Olsons' showing that CoreSource disagreed with Trustees' position does not satisfy that standard.

Second, Olsons contest Trustees' decision to deny entirely their over-$35,000 claim when the only expense clearly attributable to treatment of Donald's alleged alcoholism is a $227 bill from Dr. Olivieri (O.Mem.14). On that score Olsons cite to *Lutheran Med. Ctr. v. Contractors Health Plan,* 25 F.3d 616, 621 (8th Cir.1994) for the principle that it is arbitrary and capricious for an ERISA plan administrator to deny a covered expense simply on the basis of an excludable contemporaneous condition. As Trustees say, however, the teachings of *Lutheran Med.* are not applicable here. Trustees denied Olsons' claim only after having characterized the injuries sustained by Donald as themselves a "condition caused by alcoholism." They did not deny the claim just because Donald was

---

**6.** However problematic that logical leap might strike any reader to be in purely objective terms, it must be recognized that the just-described reading does constitute a "construction adopted by the Trustees in good faith" (TA Art. III, § 2)

and is thus to be measured by—and hence satisfies—the arbitrary and capricious yardstick. What still remains for consideration is the sustainability of the factual determinations described next in the text.

treated for alcoholism while hospitalized. Olsons' attack on that basis is unfounded.

Beyond those challenges to Trustees' construction of the Plan, Olsons also take issue with the degree of diligence (or the lack of it) with which Trustees investigated their claim before making the requisite factual determinations for denial. In that regard Olsons dispute whether Trustees had sufficient evidence to make an informed decision either (1) that Donald was alcohol-dependent at the time of the motorcycle accident or (2) that Donald's consumption of alcohol caused that accident.

■ This Court finds that Trustees had substantial evidence with which to make an informed judgment on the first of those questions. As identified earlier, a toxicology report taken over five hours after Donald had been admitted to Christ Hospital reflected Donald's blood alcohol level as .235 ml/dl (T. 12(M) ¶ 7).[7] According to a dictionary of psychiatric disorders frequently consulted by Plan administrators, such a blood alcohol level would have placed Donald in a condition somewhere between "intoxication (delirium)" and "unconsciousness" (O.App. 10; Ugolini Dep. Ex. 4–D). Additionally, Dr. Olivieri's notes of his consultation—two days after Donald had been admitted to Christ Hospital—said that Donald had suffered delirium tremens from withdrawal, so Dr. Olivieri then identified the need for a "chemical dependence consult" (T.App.20). Finally, the July 17 coding summary for Christ Hospital's bills listed alcohol dependency as a secondary diagnosis for Donald's treatment (T. 12(M) ¶ 10). In sum, Trustees' review of those medical records was sufficient to find "substantial evidence" for their determination that Donald suffered from alcohol dependency.

■ But Olsons' attack is well-grounded as to Trustees' other determination: that Donald's alcohol consumption assertedly caused his motorcycle accident. As Olsons have shown, the information before Trustees at the time of that decision was really very limited. Indeed, Trustees concede that the only records considered in that regard were hospital reports that had been tendered to them for payment of Olsons' claim (O.App. 12; Ugolini Dep. 46–47; Jensen Dep. 16–17; Cronin Dep. 28–29; T. Reply Mem. at 5–6). And scrutiny of those reports reveals only four terse descriptions of Donald's accident:

1. "31 year old white male apparently involved in dirt bike accident." (7/6/95 Report of Consultation with Olivieri, T.App. 20).

2. "The patient is a 31–year–old white male who was riding a motorcycle after he had about 4 beers and was in an accident. He fell off and hit his face on a railing." (7/11/95 Discharge Summary, T.App. 74).

3. "The patient is a thirty-one-year-old white male, who was riding a motorcycle, I believe, after he had about four beers and was in an accident, fell off and hit his face on a railing." 7/3/95 Report of Consultation with Dr. G. Mooney (T.App.77).

4. "The patient is a 31–year–old male who sustained injury in a motorcycle accident today. Details from the scene are not available." (7/3/95 Report of Consultation with Dr. S. Maltezos, T.App. 80).

None of those reports really purports to attribute the *cause* of Donald's accident to his medical condition of alcoholism or even to the fact or amount of his intake of alcohol before the accident, as contrasted with reporting his having consumed some alcohol at the time. Indeed, each does little more than to describe in general terms how Donald sustained his injuries—details of the accident scene or causation are wholly absent. Despite the obvious limitations of those reports, however, Trustees performed no additional investigation to determine the cause of Donald's accident (Tiernan Dep. 32).

Ultimately it is clear that Trustees had *no* information before them that directly linked

---

7. Olsons challenge Trustees' reliance upon that toxicology report in light of the earlier test that had found *no* alcohol in Donald's system (T.App. 110). In light of the factors identified earlier in this opinion's n. 2 that call the accuracy of that earlier test into serious question, Trustees' decision to rely upon the later report was certainly neither arbitrary nor capricious.

Donald's motorcycle accident to any alcohol dependency (or even to his consumption of alcohol) In that regard the deposition testimony of several Trustees is telling. For example, Tiernan testified (his Dep. 32):

Q: So then it is your feeling that Mr. Olson's intoxication arising from his being an alcoholic caused this accident, is that right?

A: Yes.

Q: And because of that that's why you ought not to pay, right?

A: No. I am saying we ought not pay because of the alcohol dependency, the alcoholism.

Q: But, you can't tell what the alcoholism did to cause the accident, can you?

A: I don't know.

Q: You never made an investigation, did you?

A: No, I did not.

Q: And you never found out?

A: No.

Similarly, Ugolini testified (his Dep. 116):

Q: What I'm trying to find out is what it is that he did or didn't do as a result of his alcoholism that caused the motorcycle to crash if you know.

A: I believe that his alcoholism caused him to have ingested a large quantity of alcohol because of his dependency on same which was the direct result of his crash.

Q: You don't know how his crash happened, do you?

A: No, I don't.

Other Trustees conceded the same point (see Cronin Dep. 29–30; Troike Dep. 15). And Tiernan testified—based on the available information before Trustees—that he could not rule out several possible causes for Donald's accident that would be unrelated to Donald's level of intoxication, including (1) a hazardous roadway condition, (2) the fault of another driver or (3) the malfunction of Donald's motorcycle (Tiernan Dep. 26–27).[8]

It is true, as Trustees now argue, that Olsons have never proffered a suggested explanation for Donald's accident other than alcohol-induced impairment—either upon appeal to Trustees or in this Court. Trustees now rely on that silence as justification for denying Olsons' claim (T.R. Mem.7–8):

It is both a common sense conclusion and a reasonable conclusion that Mr. Olson's accident was the result of his alcohol impaired ability to control his motorcycle. Moreover, given that Plaintiffs have failed to present a single shred of evidence that the accident had any other cause (and indeed have never even argued that there was another cause), the Trustees were fully justified in reaching their conclusion.

But it is impermissible for Trustees thus to shirk their own responsibility to exercise the fiduciary power vested in them. As Plan administrators, Trustees had a fiduciary duty to "discharge [their] duties with respect to the plan solely in the interest of the participants and beneficiaries" of the Plan (29 U.S.C. § 1104(1)(1)). Encompassed within that responsibility was a duty of proper investigation of the matters essential to the denial of Olsons' claim. As *Brown v. Blue Cross & Blue Shield*, 898 F.2d 1556, 1566 n. 11 (11th Cir.1990), quoting *Colket v. St. Louis Union Trust Co.*, 52 F.2d 390, 395–96 (8th Cir.1931) (alteration in original) says:

Good faith requires an honest effort to ascertain the facts upon which its exercise must rest and an honest determination from such ascertained facts.... [I]f [the fiduciary] knew of matters concerning which honesty would require investigation, and failed to act, or if it knew of matters which would honestly compel a given determination and it announced to the contrary, it cannot, in law, be regarded as having exercised good faith, and its action would be arbitrary.

Even under Trustees' broad interpretation of the Plan's alcoholism exclusion (which, it should be emphasized, this Court has credit-

---

8. Though this Court is not of course the factfinder—trustees will have to perform that function, as they have not done to this point—there are of course a host of reasons (those referred to in Tiernan's testimony are a few examples) that a motorcycle accident can have occurred that would have had nothing to do with Donald's drinking (or with any impairment of his faculties caused by his drinking).

ed), a determination of what "caused" Donald's injuries was necessarily a factual inquiry. In this case, then, Trustees were duty-bound to inquire into the circumstances underlying Donald's accident. It was improper for them to deny Olsons' claim upon mere speculation (and Trustees have offered nothing more than that) that his accident was a "direct result" of his alcoholism.

At least equally to the point, Trustees never provided Olsons with the appropriate opportunity to set forth any additional evidence necessary to perfect their claim. ERISA sets out certain minimum procedures and requirements for notification when an ERISA plan administrator decides to deny a benefit claim. Specifically, regulations promulgated by the Secretary of Labor to implement ERISA's 29 U.S.C. § 1133 require that the initial notice of a claim denial contain (29 C.F.R. § 2560.503–1(f) ("Reg. § 503–1(f)"), quoted and applied in *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992)):

> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

■ But here Trustees' October 24, 1995 letter to Mary did not describe any additional information that Olsons might have submitted to perfect their claim, as required by that Regulation. Nor did the letter discuss the evidence upon which Trustees claimed to rely in rejecting the claim—a step that could have put Olsons in a position to respond to factual inaccuracies. Having failed their own legal obligation, Trustees cannot now point to Olsons' silence on the issue in Olsons' administrative appeal as the basis for denying their claim.[9]

■ In light of Trustees' failure to investigate adequately whether Donald's alcohol consumption was in fact the cause of his July 3, 1995 accident—a finding essential to the denial of Olsons' claim under Trustees' own construction of the Plan—this Court finds that Trustees' denial of that claim was arbitrary and capricious. This finding, however, does not call for summary judgment to be entered on behalf of Olsons, for the record before this Court also does not show that Olsons' claim must be granted as a matter of law (i.e., that denial of the claim by Trustees, under any and all possible circumstances regarding Donald's accident, would necessarily be arbitrary and capricious) Rather, Trustees may discover upon further investigation that Donald's medical expenses actually were a "direct result" (as their February 2, 1996 denial had said) of Donald's alcoholism (in the sense that Trustees have construed the Plan's terms)

■ Under the circumstances here *Gallo*, 102 F.3d at 923 (citations omitted) teaches that this Court should "remand" this matter back to Trustees so that they may take another look at Olsons' claim:[10]

> The remedy when a court or agency fails to make adequate findings or to explain its grounds adequately is to send the case back to the tribunal for further findings or explanation. This is the appropriate remedy in an ERISA case just as in a conventional appeal, unless the case is so clear cut that it would be unreasonable for the plan

---

9. Of course this Court may not draw an adverse inference from Olsons' silence in their submissions in this litigation as a basis for upholding Trustees' denial. When reviewing Trustees' decision, this Court is limited to facts that were in the record before Trustees at the time of their decision (*Gallo*, 102 F.3d at 923).

10. "Remand" has been placed in quotation marks advisedly. Because this action is not technically an appeal from Trustees' decision, the "remand" label may not be correct in equally technical terms. But that is the language employed in *Gallo*, as well as earlier in the *Wolfe* case cited in n. 11, so this Court will follow suit.

administrator to deny the application for benefits on any ground.[11]

Upon such remand Trustees are directed to arrive at their decision, which they should reflect in appropriate findings in light of this memorandum opinion and order, only after they have more fully addressed the circumstances underlying Olsons' claim—and this directive to address the entire subject more fully must, of course, include Trustees' conformity with Reg. § 503–1(f) to the extent that is necessary for that purpose.

*Conclusion*

As indicated at the outset, the parties' cross-motions for summary judgment are denied, but Trustees' determination is vacated (*Gallo*, 102 F.3d at 923). Olsons' claim is remanded to Trustees, who are directed to reconsider whether they should deny or grant that claim after they have conducted such further proceedings as may be appropriate to determine the factual circumstances of Donald's July 3, 1995 motorcycle accident.[12] This action is dismissed without prejudice so that Trustees are enabled to do so.

**11.** [Footnote by this Court] Because the record before this Court is really silent as to any meaningful description of the circumstances surrounding Donald's accident, this Court is unable to find that vacating the present determination for further consideration by Trustees will be a "useless formality" (*Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 394 (7th Cir.1983)).

**12.** Two final observations are in order:

1. No inference should be drawn from this opinion as to what decision Trustees may (or should) reach in resolving Olsons' claim after Trustees have complied with their statutory and regulatory duties.

2. After this opinion had been completed and was awaiting transcription, Olsons' counsel (a male) served notice of the proposed filing of an unsolicited memorandum: a so-called "Replication" (this Court has elsewhere commented on the base—and chauvinistic—canard that it is *women* who feel that they must have the last word). That new submission would add nothing that has not already been covered in this opinion that would be of real relevance to the parties' dialogue, and the motion for leave to file is denied.